CORASH & HOLLENDER, P.C.                    ELECTRONICALLY FILED
Attorneys for Plaintiffs
1200 South Avenue, Suite 201
The Corporate Park of Staten Island
Staten Island, New York, 10314
(718) 442-4424
Paul Hollender (PH-5834), of Counsel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Manti's Transportation, Inc., and
Alfred J. Manti,                           Case  No. 06 Civ.06-CV-1699
                        Plaintiffs          (SJF)(RML)

              -against-

CitiCapital Commercial Corporation, f/k/a/
Associates Commercial Corporation;

                        Defendant.

## AMENDED COMPLAINT

Plaintiffs by their attorneys, Corash & Hollender, P.C., as and for their complaint against

the Defendants, allege and say:

## TABLE OF CONTENTS

Nature of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

Parties and Individuals Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

Prior Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Fraud upon the Court: Supporting Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
        A.  Knowingly false pleading and motion for summary judgment . . . . . . . . . . . . . . . . . . . -13-

       Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

       Details: New Discoveries - Associates' Pre-action Conduct . . . . . . . . . . . . . . . -16-

B.  Undisclosed Oklahoma lien "cover-up" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

C.  Premature, undisclosed applications for clean titles to Associates . . . . . . . . . . . . . . . -28-

       New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

       West Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

       Indiana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

D.  Premature, undisclosed, commercially unreasonable disposition of collateral . . . . . . . . -37-

E.  Concealment from the Court and failure to credit proceeds of collateral . . . . . . . . . . . -39-


Meritorious Defense/Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

    A. Counterclaims on Security Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

    B. Counterclaim on Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

    C. MTI's Affirmative Claim against Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-

## **<u>Nature of Action</u>**

1.      This is an action, on the grounds of fraud upon the Court, pursuant to the Savings

Clause of Fed. R. Civ. Pro. 60(b) for relief from a certain Order and a certain Judgment entered in a

prior action.  A narrative summary of that prior action and the factual basis for the present action is set

forth in the annexed Affidavit of Alfred Manti (**Exhibit 10**)[1].  Since more than one year has passed

---

[1] Exhibits 1-16 are annexed to the Original Complaint dated April 4, 2006, and filed April 12, 2006. Except as indicated herein, those exhibits are adopted and incorporated herein. The Complaint and Exhibits, bound in seven volumes, has been provided to Chambers and to Defendant. Volumes 1-3 encompass the Complaint and Exhibits 1-16. Volumes 4-7 encompass the Exhibits to a Proposed Amended and Supplemental Complaint ("PASC") (which itself is annexed as Exhibit 14 in Volume 3) which Plaintiffs will seek to file in the earlier case, if the present action to vacate the earlier Order and Judgment is successful. That proposed document, however, will be modified before filing, if the present action is successful and if permission is granted to filed the Modified PASC. Defendant, in its motion to dismiss, as originally served, objected to incorporation or reference to that PASC into the within action. Plaintiffs acknowledge that many of the allegations in that PASC would be barred by collateral estoppel and *res judicata* if asserted in the present complaint. Such facts are recited in the PASC solely for the purpose of setting forth the allegations Plaintiffs would assert in the earlier action if this Court vacates the Order and Judgment in that action, and allows the earlier case to proceed through discovery and trial. The PASC which is annexed as Complaint Ex. 14 will, itself, be modified (if permission is subsequently granted to file an Amended Complaint in *Manti I*) to reflect changes recently brought about by the voluntary dismissal of the present action against defendants other than Citicapital and the filing of the within Amended Complaint.

      The Manti Affidavit annexed as Ex. 10 is provided to explain the actions of Plaintiff Manti subsequent to the entry of Judgment in *Manti I* and how he came to discover the information presented herein as a basis for vacating that Judgment and the Order upon which it was based. To the extent that the Manti Affidavit references to facts which pre-date the Judgment those references are deemed to be as to matters which he will seek to prove in the earlier Action, should he be successful in the present Action. Any request in the Manti Affidavit to set aside (or render unenforceable) the Release is now limited to rescission and grounds therefor, including  failure of consideration, fraud, and breach, rather than the genuineness of the signature.  Also, the

from the entry of the operative Order and Judgment, a plenary action has been commenced, rather than proceeding by motion under Rule 60(b) in the prior action. Plaintiffs seek (i) to vacate part or all of a certain Order dated March 8, 2002 granting Defendant's motion for summary judgment dismissing Plaintiff's Complaint based upon the existence of a Release;  and granting Defendant summary judgment on its counterclaims for breach of security agreements and breach of that Release, and (ii) to vacate part or all of the Judgment dated June 13, 2003 and entered on June 17, 2002 upon said Order.

2.      In the event the Order and Judgment are vacated in part or in whole, Plaintiffs seek permission to file an Amended Reply to Associates' Counterclaims. If plaintiffs successfully defeat the Counterclaims in the earlier action, they will seek permission to vacate that portion of the Order as dismissed Plaintiff's Complaint based upon the Release. If the dismissal is vacated, Plaintiffs  will thereafter will seek permission to file an Amended and Supplemental Complaint in the earlier action detailing the fraudulent conduct, which continued subsequent to the commencement of the original action.

3.      Information recently obtained by Plaintiff establishes that Associates has perpetrated a fraud upon the Court by reason of  documents submitted in the earlier proceeding, and by Associates' conduct during the course of that proceeding in violation of law and without disclosure to the Court, all of which served to undermine the integrity of the legal process. This included:

      a.  Knowingly filing a patently false pleading and motion for summary judgment.

      b.  Filing applications to perfect motor vehicle liens in MTI's buses in the unrelated state of Oklahoma, after the commencement of the earlier action without the knowledge or permission of Manti and without disclosure to the Court,  which applications served  no

_____

request for relief should be deemed modified to reflect that a Notice of Voluntary Dismissal has been filed as to all Defendants other than CitiCapital; and this Amended Complaint has eliminated all Counts of the Complaint in the present action, except the first, seeking to vacate the Order and Judgment for Fraud on the Court.

valid purpose[2] and were solely intended to (i)cover-up the Associates' failure to file MTI's NY Title Applications or to perfect Associates' liens in New York at the time MTI had purchased the vehicles one year earlier, and (ii) to create the *illusion* of perfected liens and thus the predicate to Associates filing a motion for summary judgment on its counterclaims and (iii) to conceal from the Court the critical fact that Associates still had possession of MTI Original Title Documentation, which, if known to the Court,  would have been determinative of  the prior action.

c.  Filing applications in New York and two states (Indiana and West Virginia) with no connection to MTI, for post-repossession certificates of title in the name of Associates, based upon false affidavits, without disclosure to the Court, and prior to the Court's decision determining the rights of the parties.

d  Disposing of at least two buses prior to the Court's decision and at least nine others prior to entry of judgment in the earlier action, in a commercially unreasonable manner, without disclosure to the Court.

e. Concealing from the court the amount realized from the sale of the collateral and failing to take credit for those amounts in calculating the judgment amount.

### Jurisdiction and Venue

4.      Jurisdiction herein is predicated upon jurisdiction of the original action inasmuch as this action is seeking relief from an Order and the Judgment entered in that original action. That action was initially commenced on October 19, 2000 in Supreme Court, Kings County, where Plaintiff had its principal place of business.

5.      By Notice of Removal filed by Associates on  November 14, 2000, the action was removed to the present court pursuant to 28 U.S.C. §§ 1441 and 1446.

6.      Furthermore,  this Court has subject matter jurisdiction over this case under 28 U.S.C.

---

[2] The liens could have been valid only if Manti had re-submitted the preliminarily filed documents and paid the required Oklahoma excise tax; however Associates, desirous of preventing Manti from learning of its actions, which included transmittal to Oklahoma of the Original Title Documentation which Associates had failed to file in New York at the time of MTI's purchase of the buses (and desirous of preventing Manti from receiving possession of the Original Title Documentation), failed to deliver the Oklahoma materials to Manti as required by Oklahoma law. Thus no Oklahoma certificate of title was ever issued, and the liens attached to nothing.

§ 1332, as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and

costs, and there is complete diversity of citizenship between the plaintiffs and the defendant.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial

part of the events giving rise to this action occurred in this district, and the business which borrowed the

money from Associates was located  in this district.

**Parties and Individuals Involved**

8.      **MANTI'S TRANSPORTATION, INC**.  ("MTI") is a  New York corporation

which, until June 1998 was engaged in the business of providing commuter bus service in and about the

New York City area. It had a license to operate in the 48 contiguous states from the U.S. Department

of Transportation ( MC175916), and had the only permit issued by the NYS Department of

Transportation (No. 29573) which allowed a private company to operate along regularly franchised

bus routes,  thus giving it exclusive rights (other than the NYC Transit Authority), to pick up and

discharge passengers at New York City bus stops. MTI had its principal place of business at 270 Van

Brunt Street, Brooklyn, N.Y. 11231, until it ceased operations, and thereafter its address was at Alfred

Manti's residence in Staten Island, New York. MTI is a citizen of New York.

9.      **Alfred J. Manti**, ("Manti") the  President and sole shareholder of MTI  resides at 34

Hastings Street, Staten Island, N.Y. 10305 and is a citizen of New York.

10.      **Deborah Manti**, wife of Alfred Manti has never been a shareholder or officer of MTI.

11.       **METROTRANS CORPORATION**, was a bus manufacturer with its principal

place of business located  in Griffen, Georgia. Metrotrans was traded on NASDAQ between June of

1994 and on or about August of 1999, when it failed to meet NASDAQ rules for maintaining minimum

market value. Metrotrans filed a petition for relief under Chapter 11 of the Bankruptcy Code on

-5-

December 21, 1999 in the Northern District of Georgia (Case No. 99-13392-whd).

12.      **D. Michael Walden**, ("Walden") served as President, Chairman of the Board, and CEO of Metrotrans through February of 1999 when he resigned for medical reasons, having been absent from the company since November of 1998, thereafter continuing as Director and Vice President.[3]

13.      **William Bailey** ("Bailey") at the time of Manti's dealings with Metrotrans, served as regional salesman for Metrotrans from the Collingswood,  N.J. office.

14.      **ASSOCIATES COMMERCIAL CORPORATION,** at all relevant times, through November, 2000,  was a subsidiary of Associates First Capital Corp which  was publically traded on the NY Stock Exchange. It was acquired by Citigroup, Inc., through merger on November 30, 2000 into Citigroup's subsidiary **CITICAPITAL COMMERCIAL CORPORATION**, the surviving entity, by which name Associates then became known.   **CITICAPITAL COMMERCIAL CORPORATION** ("CitiCapital") is organized and existing under the laws of the state of Delaware, with its  principal place of business located at 250 East Carpenter Freeway, Irving, Texas 75062, (the "Texas Headquarters") thus it is a citizen of both Delaware and Texas.   At the time of Manti's dealings with Associates it maintained an office at 180 Sheree Blvd, Bldg 1300, Exton, Pa 19341.  With regard to the events referenced herein, Associates  provided commercial financing services to prospective purchasers (including MTI) of buses from Metrotrans and other sellers of buses, vans, and other multi-passenger commercial transportation vehicles. Associates Commercial Corporation and CitiCapital Commercial Corporation are collectively hereinafter referred to as "**Associates**."

---

[3] *See* SEC form 10-Q for July, 1999, filed 8/23/99. Walden was the last remaining member of the Board of Directors through the liquidation of Metrotrans and was a holder of approximately 20% of the shares of Metrotrans (Disclosure Statement dated June 30, 2000, U.S. Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 99-13392-WHD)

15.   **GENERAL ELECTRIC CAPITAL CORPORATION** ("GECC") acquired the Transportation Financial Services Group of Citicapital Commercial Corporation[4] in January 2005. Upon the acquisition, GECC continued the office which Associates had maintained at 180 Sheree Blvd, Bldg 1300, Exton, Pa 19341. The Transportation Financial Services Group of General Electric Capital Corporation, operating as part of GE Commercial Finance, has its principal offices at 300 East Carpenter Freeway, Irving Texas.

16.   **Larry Shute** ("Shute"), at the time of Manti's dealings with Associates, served as Vice President and Branch manager of Associates' office in Exton, Pennsylvania  Shute also served as Al Manti's personal account representative at Associates.  Upon information and belief, as a consequence of the events which gave rise to in an earlier action by Manti against Associates, on or before August 21, 2000 Shute was replaced as Branch Manager, but continues to be employed by GECC at the same office.

17.   **John Umberger** ("Umberger")  served as an employee at Associates' office in Exton, Pennsylvania while Shute served as Branch Manager, and subsequent to Shute became Branch Manager. Upon information and belief, Umberger continues to be employed by GECC at the same office.

18.   **Sandra Koonz** ("Koonz"), at the time of Manti's dealings with Associates, served as Collection Manager at Associates' office in Exton, Pennsylvania.

19.   **Lawrence J. Pelka**, ("Pelka") at the time of Manti's dealings with Associates, served as President of Associates and worked from its Texas Headquarters.

---

[4] Citicapital continues in business for non-transportation lending at its pre-existing offices.

20.     **Helen Krueger** ("Krueger"), in January 2001, served as Title Coordinator for Associates, at the Texas Headquarters.

21.     **ROAD READY REGISTRATION, INC**. ("Road Ready") is a California corporation with its principal place of business at 1420 Miliken Ave Suite 508, Ontario, Ca. 91761,  is in the business of providing bulk processing of motor vehicle title and lien recordation in all 50 states of the United States.

22.     **Susan Banks-Nickel** ("Banks-Nickel") is the president of Road Ready Registration, Inc.

23.     **Rachel Carrington** ("Carrington") is an employee of Road Ready.

24.     **NEW JERSEY BUS SALES** at the time of Manti's dealings with Associates was in the business of selling buses and had its principal place of business in Bordentown, New Jersey.

25.     **Joseph Wolfe**, ("Wolfe"), at the time of Manti's dealings with Associates, was a salesman for New Jersey Bus Sales.

26.     **CT LINES, INC.** d/b/a/ Campus Coach ("Campus Coach")  is in the business of operating and selling buses, and has its principal place of business at 545 Fifth Ave  New York, N.Y.

27.     **Bertram J. Askwith** (a/ka Mike Long) ("Askwith") is president of CT Lines, Inc.

28.      **JR CORELLI ASSOCIATES INC**. d/b/a Lakeview Custom Coach ("Lakeview") is in the business of selling commercial motor vehicles and has its principal place of business in Oaklyn, New Jersey.

29.     **ACTION AUTO LEASING, CORPORATION** ("Action") is in the business of

selling buses and other vehicles, and has its offices in Harrison, N.Y.

30.     **Lawrence Jacobs** ("Jacobs") is the president of Action.


## Prior Action

31.     The prior action, entitled *Manti's Transportation, Inc. v. Associates Commercial Corporation*, Case  No. 00Civ.6807(FB) (RML) ("*Manti I*") was assigned to Judge Frederic Block. A copy of the Docket for this now closed case is annexed (**Exhibit 1**).

32.      MTI, a once thriving commuter bus line, commenced *Manti I* with a complaint (**Exhibit 2**) dated October 17, 2000 and filed in Supreme Court, Kings County against Associates Commercial Corporation ("Associates") (now known as CitiCapital Commercial Corporation) which had served as the financing entity for MTI's purchase of  buses.  In that action, plaintiff asserted four causes of action against Associates:  for breach of contract,  fraud, unjust enrichment, and tortious interference with business.  Essentially the complaint alleged that Associates had not delivered certain buses as ordered, in that they could not pass NYS inspection for use during warm weather due to the absence of proper air conditioning, and that Associates failed to take action to correct the problem. The complaint also alleged that Associates had thereafter fraudulently induced Manti to surrender his entire fleet of buses in the summer of 1998 under false pretenses, that Associates had accepted payments from Manti without honoring its own obligations, and that Associates had tortiously interfered with Manti's attempts to purchase new buses to re-establish his business.

33.     Associates removed the action to federal court (Docket # 1), and filed an Answer (Docket # 4) (**Exhibit 3**) denying the allegations in the complaint and asserting  fifteen Affirmative

Defenses, two counterclaims, but *no third-party action against the guarantors[5]*.  The counterclaims

that were asserted by Associates against MTI were for breach of contract on the two security

agreements executed on August 21, 2000, and a third counterclaim for attorneys fees and costs

resulting from MTI's commencement of that earlier action in violation of the release.

34.     MTI  filed a Reply to the Counterclaim (Docket # 6) (**Exhibit 4**).

35.     On March 12, 2001, Associates' counsel Bennett R. Katz submitted a letter (Docket

#7)  (**Exhibit 5**) seeking permission to submit a motion (a) to dismiss on the pleadings; (b) for sanctions

and ©) for summary judgment.  The letter enumerated Associates' legal support for such a motion.

> **First**, that the <u>entire complaint </u>was barred by the Release of November 18, 1999, which, Katz
> asserted, among other grounds, was "for valid consideration";

> **Second**, that  "<u>A claim alleging fraud </u>will not lie absent sufficient independent factual support
> for such a claim....In essence a claim for fraud cannot be supported solely by allegations
> that are duplicative of those pleaded in support of a claim for breach of contract, which
> is precisely the case here. Therefore, the plaintiff has failed to state a claim for fraud,
> and the claim for fraud must be dismissed."

> **Third**, "plaintiff received the loan proceeds, and defaulted on the repayment of the principal
> and interest. The complaint completely fails to allege how such facts could have resulted

---

[5] To support its Fifth Affirmative Defense that the November 18, 1999 refinance constituted an Accord and
Satisfaction, as to the prior obligations, which had been refinanced on March 31, 1998,  Associates counsel attached as Exhibit B
to its Answer, copies of the March 31, 1998 refinance documents. Counsel, however, *inadvertently* also attached a purported
Continuing Guaranty of Alfred and Deborah Manti dated <u>July 11, 1996.</u>  Manti asserted in the earlier action that the signatures
on this document were forged. Inasmuch as the Court ruled that the November 18, 1999 Mutual Release executed by Manti was
genuine and binding, any claim that the forgery of Mr. and Mrs. Manti's signatures on the earlier document is barred. However,
on <u>November 18, 1999</u>, Associates obtained from both Alfred and Deborah Manti, new and genuine personal Guaranties (see
**Exhibit 14**, Proposed Amended Complaint, Exhibit H-5). Also, genuine signatures were obtained from both Alfred and Deborah
Manti a second time, on a personal guaranty executed on <u>August 21, 2000</u> (*see* **Exhibit 3**, Associates Answer in the original
action, part of Exhibits C and D). If Associates counterclaims were truly just an ordinary collection case, it would be expected
that Associates would have impleaded the individual guarantors on the *genuine* November 18, 1999 and August 21, 2000
guarantees. It is suspected that the failure to do so was based upon a fear that suing on the guarantees would complicate what
was presented as a simple collection case, by involving depositions regarding forgery of earlier personal guarantees which Manti
had asserted were intended to cover up criminal activity within Associates, involving the theft of cash contract deposits. *Thus
the failure to sue Alfred and Deborah Manti in the original action, constituted a calculated act by Shute to deceive Judge Block into
believing this case was a run-of-the mill collection matter involving a deadbeat borrower, who simply sought to take the offensive
by suing Associates on a baseless theory, before they sued him.*

in Associates' <u>unjust enrichment</u>."

**Fourth,** "In order to state a claim for <u>tortious interference with prospective business advantage</u>, a plaintiff must show (1) business relations with a third party; (2) defendant's interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) injury to the relationship."..."Interference with a business relation of another is not actionable unless plaintiff shows that defendant was motivated solely by malice or that defendant effected the interference by unlawful means."

36.     Associates obtained its desired relief in the original action by bringing a motion dated May 4, 2001) (Docket # 16) (**Exhibit 6** annexed without exhibits) for summary judgment on the complaint of MTI, and  on Associates' counterclaims.  This motion was based upon Affidavits of attorney Bennett R. Katz, and Shute both sworn to on May 4, 2001.

37.     Central to Shute's affidavit was a  purported Mutual Release said to have been executed by Manti and Shute (**Exhibit 7**).  Shute stated in his affidavit that he had mailed this document to Manti to review prior to the closing.

38.     Manti, through his Response to Notice to Admit, various letters by his counsel, and in his opposition to the motion, admitted that he signed the release but the he did so out of the mistaken belief that the release was approved by his attorney. He stated that he <u>did not</u> receive a copy in advance of the closing; and that he did not discuss the release with his attorney Vincent Pitta prior to the closing, as averred by Shute. Furthermore, he knew his attorney had not been provided with a copy, he would not have signed it without attorney approval, because for 1 ½ years prior to November 1999 execution date, Pitta had been assisting him in negotiating a mutual release with Metrotrans Corp., the bus manufacturer, over the very same series of facts.[6]

---

[6] This was corroborated by Pitta in an affidavit sworn to March 20, 2001 (Exhibit I to Proposed Amended and Supplemental Complaint, annexed hereto as **Exhibit 14**).

39.     Simultaneously with the motion for summary judgment, Associates also filed a motion

for sanctions (Docket #22), in which Associates counsel stated at Paragraph 19:

> "it is obvious that plaintiff, owing Associates approximately $1.4 million,
> has sought to 'beat Associates to the barn door' by first filing a suit
> containing a variety of allegations <u>without any evidentiary support</u> in an
> effort to avoid having to repay monies owed to Associates, despite the
> existence of a valid release.  The conduct by plaintiff and counsel is an
> abuse of the litigation system for an improper business purpose - a
> strike suit....The individual referenced in the Complaint, Larry Shute,
> has essentially been accused of criminal acts in a publicly filed
> document...Based upon the compelling facts in this scenario, this matter
> cries out for Sanctions pursuant to Rule 11." (emphasis added).

Associates offered to withdraw its motion for sanctions if, within 21 days, MTI withdrew its complaint

with prejudice.

40.     Instead, Manti's moved to withdraw without prejudice (Docket # 26), in response to

which Associates made cross-motions to dismiss with prejudice (Docket #24) and for Sanctions dated

May 22, 2001 (Docket # 29).

41.     Associates' counsel requested, in a letter, that the motions be decided "in an

accelerated manner" (Docket # 29).  The Katz Affidavit of June 5, 2001 in Reply to Manti's

Opposition (Docket # 21) states at ¶3 that

> "the *raison d'etre* for plaintiff's case is to <u>throw enough mud at
> Associates to evade repayment</u>. This is obviously a transparent
> manipulation of litigation for an improper business purpose in violation
> of Fed.R.Civ.P. 11. This conduct has caused Associates significant
> costs and has improperly taken up the Court's time." (emphasis added)

42.     Based upon the documents submitted by Shute, Judge Block concluded that this was a

simple "collection case" by Associates, and that Manti was bound by the Release.  After reminding

Manti that he had the right to pursue criminal charges if he was able to identify any forgeries in earlier

documents, Judge Block limited himself to the issues of (I) the mutual release of November 18, 1999 and (ii) the August 21, 2000 security agreements (which Manti conceded contained genuine signatures). By an Order dated March 8, 2002 (Docket # 53) (**Exhibit 8**), Judge Block granted Associates' summary judgment motion, dismissing Manti's complaint and awarding Associates the right to a money judgment on its counterclaims,[7] and awarded Associates damages (attorneys fees and costs) for Manti's breach of the Release.

43.     A judgment to that effect, (against MTI a was entered on June 17, 2002 (**Exhibit 9**):

> Judgment, ordering and adjudging that plaintiff's action against Associates by dismissed on the merits. Associates is granted judgment on its counterclaims against Manti's. Manti's shall pay Associates the total of $1,117,109.11 for breach of a Security Agreement dated 8/21/00 and $179,482.20 for breach of a second Security Agreement also dated 8/21/00 plus 9% interest per annum from the date of default. The date of default for both Security Agreements which are the subject of Associates counterclaims is 10/1/00. Manti's shall reimburse Associates $106,936.22 in attorney's fees and costs for breach of the Release ( Docket entry # 67).

**Fraud upon the Court: Supporting Facts**

**A.  Knowingly false pleading and motion for summary judgment**

**Overview**

44.     Associates' Answer in *Manti I*[8] sets forth three counterclaims against MTI: two to enforce the final refinance security agreements entered into on August 21, 2000, and a third for breach

---

[7] The Court denied both Manti's motion to withdraw without prejudice and Associates' motion for sanctions, and did not reach the question of dismissal of Manti's complaint pursuant to Rule 41(b) for failure to sign the complaint.

[8] Exhibit 3 hereto

of the Release dated November 18, 1999.

45.     Manti has discovered, commencing in October 2005, factual information which conclusively establishes that Associates had no right to relief under those security agreements, because Associates had breached its obligations under the agreements by secreting and refusing to file with the NYS Department of Motor Vehicles the documentation required for issuance of  New York certificates of title to MTI: i.e., <u>MTI never had titles to the vehicles, and Associates never had perfected New York motor vehicle liens.</u>

46.     The same newly discovered evidence establishes that the Release which forms the basis of Associates third counterclaim is unenforceable for failure of consideration and fraud.

47.     Shute, who, upon information and belief, authorized the filing of the counterclaims, and signed the Affidavit in support of summary judgment, was a principal wrongdoer and at the time was fully aware that Associates had no basis for asserting any of its counterclaims.

48.     The new evidence establishes that (**I**) Associates breached the security agreements, and rendered the Release unenforceable because Associates <u>retained possession of the original title transfer documents</u>[9] ("MTI's Original Title Documentation") provided by the entities which sold MTI the 18 vehicles between November 18, 1999 and August 17, 2000, <u>rather than delivering them to the NYS Department of Motor Vehicles</u> ("NYS DMV"), thus preventing MTI from obtaining certificates of title and registering its buses; (**ii**) rather than delivering those documents to the NYS DMV or to Manti, Associates, Associates secreted these documents in its  Pennsylvania office;  (**iii**) that after

---

[9] Including such documents as the original certificates of title in the name of those entities selling to MTI, which were indorsed to MTI; original lien satisfactions from the lenders to those sellers; original executed  bills of sale; Retail Certificates of Sale by the dealer who sold the buses to MTI; fully executed original applications for New York certificates of title; and original executed NYS sales tax exemption certificates

Manti alerted senior Associates executives in Texas that he had never received his NY certificates of title, the title transfer documents which had been secreted in Pennsylvania , were not delivered to the NYS DMV or to Manti, but instead, were sent by Associates' Pennsylvania office to its Texas headquarters; and that (**iv**) personnel at Associates Texas headquarters outsourced to Road Ready the task of delivering those documents to the Oklahoma Tax Commission, <u>during the course of the original action</u> pending before this Court, for the purpose of recording their liens, while continuing to deprive MTI of its New York certificates of title needed to register and operate the buses.

49.     Although a new suit on these facts would be barred by reason of the preclusive effect of Judge Block's Order and Judgment, such litigation may proceed within the confines of *Manti I* if this Court were to vacate Judge Block's Order and Judgment upon grounds of Fraud on the Court.

50.     In February of 2006, solely as a result of Manti's persistent investigation, he obtained possession of, <u>for the first time</u>, his Original Title Documentation.[10] These documents, provided by GECC, the successor -in- interest to Associates' transportation finance division, were discovered in the former Associates' files in GECC's storage facility in Dallas, Texas. Although these documents were statutorily required to have been delivered by Associates to the NYS DMV <u>immediately upon receipt after MTI purchased the vehicles in 1999 and 2000,</u> they had been secreted by Associates after return from the Oklahoma recording office where Associates had sent the documents in <u>January 2001</u>, prior to making its summary judgment motion.

51.     If this court vacates the earlier decision, Plaintiffs will establish that, Associates conduct prior to commencement of *Manti I* was designed to and did, in fact, impair MTI's rights by <u>preventing</u>

---

[10] With these original documents Manti, should he choose to, could now obtain New York certificates of title, and seek to recover the vehicles from parties who purchased them from Associates.

-15-

MTI from ever operating the buses it had purchased using Associates' financing.

52.　During the course of *Manti I*, Associates defrauded Judge Block by asserting an absolute right to recover on its security agreements based upon MTI's failure to make payment, and an absolute right to recover from MTI for breach of a Release for which the promised consideration (i.e. the ability to purchase and operate a fleet of 18 vehicles) was purposely withheld and concealed by Associates at the time of making its motion for summary judgment, by reason of Associates' continued possession of the very documents which Manti required to obtain the certificates of title he never had received.

53.　Furthermore, in blatant disregard for the facts which he, himself, had orchestrated, Shute signed a patently false affidavit which he presented to Judge Block in support of summary judgment, stating:

> These security agreements were third-party transactions wherein each vendor was paid in full, plaintiff had title to the vehicles and Associates had a lien on the title of each vehicle.
>
> ***
>
> Under all the circumstances set forth above, I am informed and verily believe that plaintiff has not stated any viable claim for relief against Associates, that Associates is entitled to summary judgment on its counterclaims and that sanctions against plaintiff and plaintiff's counsels are warranted [11]

### Details: New Discoveries - Associates' Pre-action Conduct

54.　Between November 18, 1999 and July 24, 2000, Associates and MTI engaged in a series of transactions whereby Associates loaned MTI funds to purchase a new fleet of 18 buses to

---

[11] Associates Motion for Summary Judgment, Exhibit 6 hereto at pp.16 and 19.

recommence its business.

55.     The first transaction occurred on or about November 18, 1999, whereby Associates

provided the financing for the purchase of two buses for CT Lines, Inc.(Exhibit H-2[12]) a 1980 Crusa,

and a 1981 MCI.

56.     On that date Associates, by Shute, provided to CT the funds for the purchase price of

the two buses.

57.     *Upon payment of the purchase price, CT produced CT's certificates of title, endorsed

to MTI, and all other documents (MTI's Original Title Documentation) required to title the vehicles in

New York, providing them to Shute per Shute's instructions.

58.     *Shute took possession of MTI's Original Title Documentation, consistent with his pre-

closing instruction sheet[13] that he would personally take the documents to the NYS DMV to obtain the

new certificate of title for MTI, and have  Associates' lien recorded thereon.

59.     Pursuant to Section 2109 of the NYS Vehicle and Traffic Law, the Commissioner of

Motor Vehicles, upon receipt of all required documentation and fees, is required to issue a certificate of

title and mail it to the owner of the vehicle.

60.     *MTI never received the NYS certificates of title to these vehicles.

61.     *Between November 1999 and August 2000, Manti made innumerable telephone calls

---

[12] Lettered Exhibits are set forth in the PASC (exhibits to which are found in Volumes 4-7 of the initial filing in this action) and, to the extent referenced herein are incorporated by reference herein. Plaintiffs specifically refrain from contesting any issue of fact which is barred by reason of Judge Block's Order. References herein are intended to reflect facts not in dispute. Paragraphs preceded by an asterisk are refer to matters which Plaintiffs will seek to prove if this Court vacates Judge Block's Order and Judgment are not to be construed as presently asserted allegations, and will be deemed denied by Defendant.  To the extent any references are made to documents or facts discovered after the entry of Judgment in *Manti I* (June 17, 20002) which relate to matters that are barred by reason of that judgment, the references are intended solely to identify evidence which Plaintiffs assert establish grounds for vacating that judgment and the Order upon which it is based.

[13] Ex. G-2

and personal visits to Associates, Shute, and Umberger, seeking to obtain possession of the certificates of title so he could register the vehicles.

62.     *Associates representatives initially advised Manti that they had not yet received the titles, and thereafter, that they had received them, but that other persons at Associates had instructed them not to release them yet to Manti.

63.     On or about October 1, 2005, Manti discovered, by filing a freedom of information request with the NYS DMV, that title to 1980 Crusa was still in the name of CT Lines, that it had been so titled since April 30, 1997, and that no New York certificate of title had ever been issued to MTI and that no lien in favor of Associates had ever been recorded.[14]

64.     On or about October 1, 2005, Manti discovered that title to the 1981 MCI was likewise still in the name of CT, and had been since February 1, 1982, that no New York certificate of title had ever been issued to MTI and that no lien in favor of Associates had ever been recorded. [15]

65.     In December of 2005 Manti discovered that the two buses he had purchased from CT were still physically garaged at CT's yard, and were had been operated exclusively for CT's benefit notwithstanding MTI's purchase in November 1999. Askwith, when confronted with this fact, did not have a credible explanation.[16]

66.     MTI  purchased a minibus from Lakeview[17] as part of Manti's  plan to re-start the defunct business with financing from Associates.

---

[14] Ex J-1, p.1

[15] Ex. J-2, p.1

[16] See Manti Complaint Affidavit (Exhibit 10) at pp 17-20

[17] Ex. K pp 1-10

67.     *The title to this minibus was indorsed to MTI and it was delivered to Shute for processing, pursuant to Shute's instructions.

68.     On or about October 4, 2005 Manti discovered, via a freedom of information request that no New York title had ever been issued to MTI for this minivan, and that no lien in favor of Associates was ever recorded.[18]

69.     Associates also financed the purchase and reconditioning of 15 additional buses for MTI through Action. Associates issued checks, under conditional sales contracts/security agreements signed with MTI as follows:

| Date | Amount | No. of Vehicles |
|------|--------|-----------------|
| 12/3/99 | $ 180,000 | 3 |
| 3/6/00 | $ 120,000 | 2 |
| 3/31/00 | $ 101,500 | 2 |
| 4/17/00 | $ 240,000 | 4 |
| 8/2/00 | $ 232,000 | 4 |
| TOTAL | $ 873,500 | 15 |

70.     Manti obtained Purchase documentation for these buses from Action in October 2005, and Official Vehicles Title Records from the NYS DMV annexed hereto as Ex. L-1 through L-15.

71.     The DMV records referenced in the prior paragraph establish that record ownership is still in the name of the companies which sold the vehicles to MTI and, where there was a prior lien, those satisfied liens are still appearing as unsatisfied.

72.     Exhibits L-1, L-2 and L-3, Certificates of Title dated November 8, 2005, show Action

_____

[18] Ex. K p.11

as current title owner of these vehicles (and Action's lender, Sovereign Bank, as lienholder)[19]. These vehicles were actually sold by Action to MTI on December 6, 1999.

73.      *Action delivered the titles and Sovereign Bank lien satisfactions to Exhibits L-1, L-2 and L-3 to Associates.[20]

74. * Exs. L-4 and L-5, buses acquired by Action from ABC Bus, for resale to MTI, were titled in Minnesota to ABC Bus. Those titles were  indorsed in blank by ABC and transferred to MTI via Retail Certificates of Sale from Action, accompanied by  NYS forms MV-82 (Vehicle Registration/Title Application), Releases of Lien from CIT (ABC's lender) and sales tax exemption forms.[21]

75.      No New York certificates of titles were ever issued for these buses identified as Exs. L-4 and L-5. Thus, there are no titles in the name of MTI, and no recorded liens in the name of Associates.[22]

76.      Ex. L-6 was separately acquired by Action for MTI and was sold pursuant to a Retail Certificate of Sale[23] however no New York certificate of title or recorded lien was ever issued.[24]

77.      Ex. L-7 was sold by Action to MTI. However, because no title application on behalf of MTI was ever filed, nor was a lien in favor of Associates recorded[25], an "enterprising" third party was

_____

[19] Ex. L-1 pp.10,11; Ex. L-2 pp. 5,6; Ex. L-3 pp. 5,6.

[20] Note at Ex. L-1 pp 1,2, and 5 the receipts for overnight packages to Associates.

[21] Ex L-4, pp.1-10; Ex. L-5 pp. 1-8.

[22] Ex. L-4 p.11; Ex.  L-5  p.9

[23] Ex. L-6 pp 1-5

[24] Ex.  L-6 p 6

[25] Ex. L-7 p. 5

able to acquire title to the bus, for which MTI had paid $54,000, by paying only $140.25 in sales tax (based upon imaginary storage charges) plus $200 to an auctioneer to foreclose a bogus "garageman's lien" without Manti receiving notice.[26]

78. Exhibits L-8, L-9, L-10 and L-11 were part of the group of buses acquired by MTI via Action from ABC, with Minnesota titles, and as to which no New York titles or liens were recorded, as Manti discovered on or about October 4, 2005[27]

79. Exhibits L-12 and L-13 were also acquired by MTI through Action and ABC, with New Jersey titles. As to these two buses Associates subsequently acquired post-repossession New York titles in its own name (discussed below), however the chain of recorded New York titles was ABC, followed by Associates, without any intervening recorded ownership in the name of MTI![28]

80. Exhibits L-14 and L-15 were also acquired by MTI through Action and ABC, with Minnesota titles, however no New York titles or liens were ever recorded as to these vehicles. [29]

81. On or about October 12, 2000 Umberger signed and caused to be mailed from Exton, Pa. to MTI, Alfred J. Manti, Debra (sic) M. Manti (all in Staten Island, N.Y.) and others, notices that absent either (i) payment of the full balance , (ii)  payment of arrears or (iii) return of the vehicles, then Associates had the right to accelerate the obligations of MTI under the (Ex. Q-1,-2) August 21, 2000 Security Agreements (Ex. Ex. R-1 and Ex. R-2).

82. * At the time the aforesaid notices were mailed, Umberger had actual knowledge that

---

[26]Manti Complaint Affidavit (Ex. 10 herein) at pp 14-17 and Ex. L-7.

[27] The last page of each exhibit is the official NYS DMV "Certification of No Record Found"

[28] Ex. L-12 p.7; Ex. L-13 p. 5

[29]Ex. L-14 p 6; Ex. L-15 p.6

MTI had never received titles to any of the 18 vehicles.

83.     In sum, between October and December 2005 Manti discovered that not merely had Associates failed to deliver to him the titles to the 18 buses, the absence of which had prevented him from operating, but Associates had not even obtained filed MTI's New York Title applications or recorded Associates' liens on these buses.

84.     Inasmuch as Shute had established and enforced  the requirement that all MTI' Original Title Documentation be delivered to Associates, which would file the documents with the NYS DMV, and inasmuch as Manti had repeatedly requested of Shute and Associates to  provide the titles to him so he could register and commence operation of the 18 buses, Shute clearly knew at the time of filing the counterclaims and at the time of signing the Affidavit in support of Associates motion for summary judgment and sanctions, that Associates was the specific cause of MTI's inability to operate its buses, that Associates had breached the security agreements, and that the Release was unenforceable by reason of failure of consideration and fraud.

85.     If Judge Block had been aware of the aforesaid, he would not have granted summary judgment to Associates.

**B.  Undisclosed Oklahoma lien "cover-up"**

86.     At no time prior to November 27, 2000 had MTI's Original Title Documentation been filed with the NYS DMV.

87.     On November 27, 2000, the date of Associates' Answer in *Manti I*,  Associates had in its actual possession MTI's Original Title Documentation.

88.    Associates failed to disclose to the Court at any time during the pendency of *Manti I*

that it had in its actual possession MTI's Original Title Documentation.

89.    Oklahoma law, as distinct from that of other states,  allows a secured creditor to file a

motor vehicle lien in advance of obtaining an Oklahoma certificate of title[30] (See **Ex. W**). The

procedure allows for the filing of a "Lien Entry Form", accompanied by the original certificate of title of

the state where the vehicle is currently titled.   The Oklahoma Tax Commission then records the lien

only and returns the out-of-state original certificate of title (stamped to record the lien) along with a

clocked-in copy of the Lien Entry Form, to the entity that submitted the form.

90.    Pursuant to Title 47 of the Oklahoma Statutes, §47-1110(A)(4), the secured creditor

has the obligation  to return the title documents to the owner with a notice to complete the Oklahoma

registration process by submitting the original title documents, an affidavit confirming the lien, an

application for an Oklahoma certificate of title  and the required fee within 30 days. At that second

stage, after receiving from the owner the applications for Oklahoma registration and  title, the

Oklahoma Tax Commission issues and mails a new title to the owner.  Upon information and belief, this

procedure is designed to protect good-faith lenders from unscrupulous borrowers who might seek to

obtain certificates of title absent notation of a lien. The procedure is available only for intended to be

operated in, and titled in, the state of Oklahoma.

91.    When the Secured Creditor is holding the original out-of-state certificate of title, the

regulations of the Oklahoma Tax Commission require that the lienholder "send the title to the

---

[30] Title 47 of the Oklahoma Statutes §§47-1110 (A)(1) - (3).

-23-

Commission, so that an Oklahoma title with the lien noted thereon may be delivered to the debtor." (

see **Ex. W** at Regulation 710:60-5-113 (b)).

92.     In or about January 2001, after filing an Answer in this Action, Associates sent MTI's

Original Title Documentation for 17 of  MTI's 18 vehicles from Associates' Texas Headquarters to

Road Ready in California with instructions to prepare, as agent for Associates (and as agent for MTI

under the limited power of attorney granted to Associates by MTI in its security agreements)

Oklahoma Title Applications in the name of MTI and to prepare Lien Entry Forms to record

Associates' liens in Oklahoma.

93.     On or about January 19, 2001 Road Ready prepared such Lien Entry forms at

Associates' request.

94.     On or about January 22, 2001 Road Ready prepared such Title Applications at

Associates' request

95.     On or about January 22, 2001, Road Ready shipped to an Oklahoma Motor License

Agent, with regard to 17 of MTI's vehicles, (I) Oklahoma Title Applications naming MTI as Owner ;

(ii) Lien Entry Forms for said vehicles listing MTI as debtor and Associates as secured party; (iii)

MTI's Original Title Documentation, including original certificates of title issued by various states to

MTI's predecessor's in interest in each vehicle, indorsed to MTI or transferred by a Retail Certificate

of Sale, original lien satisfactions for the liens on the predecessor's titles, and applications in the name of

MTI for Oklahoma certificates of title.

96.     On or about January 29, 2001 Oklahoma Motor License Agent Kenneth R. Newey

received the documents sent by Road Ready. Newey then (I) verified the VIN numbers from the

original certificates of title issued to MTI's predecessors in interest, (ii) place a "Lien Entered" stamp on the original out-of-state certificates of title, (iii) place a "Lien Entered" stamp on the Oklahoma title applications, (iv) caused the liens to be recorded in the records of the Oklahoma Tax, (v) issued a receipt for $10 for the Lien Entry Form and then (vi) returned all documents except two copies of the lien entry form back to Road Ready.

97.     Upon receipt back from Oklahoma, Road Ready returned all documents to Associates, including "Copy 6 Debtor Notice to Register Vehicle", which contains specific instructions requiring that the owner of the vehicle deliver the original documents (lien entry form, prior original title and lien release, and Oklahoma Title application),  pay all excise taxes and register the vehicle within 30 days of purchase, at the risk of a substantial penalty for failure to comply.

98.     Associates failed to either deliver the aforesaid documents to MTI at any time, or to return them to the Oklahoma Tax Commission with the required fees to cause an Oklahoma Title and Registration to be issued to MTI, but rather retained all documents in its Texas files.

99.     Inasmuch as Associates failed to comply with its statutory obligation to deliver the Lien Entry forms, Oklahoma title applications and MTI's Original Title Documentation,  electing to retain such documents in its own office files, with the result that no Oklahoma certificate of title was ever issued to any of MTI's buses, there was no title to which Associates' purported liens ever attached.

100.     Associates had no valid purpose in filing Oklahoma "Lien Entry Forms" .

101.     Absent a valid purpose for filing the Oklahoma "Lien Entry Forms" Associates conduct could only have been for the improper reasons of continuing to conceal its failure to file MTI's Original Title Documentation with the NYS DMV, to create the appearance of its collateral being protected by

-25-

liens in the event of audit, <u>and to create a colorable basis for asserting in papers before this Court that</u> **Associates had liens on the titles** to MTI's buses.

102.    Likewise the preparation of Oklahoma title applications which were stamped "Lien Entered" in conjunction with the filing of the Lien Entry Forms, but were never themselves filed, or even sent to MTI with instructions to file them, had no legitimate purpose, and could only have been prepared to assist in obtaining the Lien Entry stamps and <u>to create a colorable basis for asserting in papers before this Court</u> **that MTI had titles** to the buses.

103.    On May 4, 2001, in conjunction with a motion Shute had caused his attorney to prepare and sign, Shute signed an Affidavit in support of Associates' motions for summary judgment and sanctions.[31] Shute's Affidavit asserted :"<u>[P]laintiff had</u> **title to the vehicles** <u>and Associates had a</u> **lien on the title** <u>of each vehicle</u>"[32]

104.    <u>No disclosure was made to Judge Block</u> that the Oklahoma Lien Entry forms were filed subsequent to the commencement of the action;  that Associates had in its possession, at the time of making its motions, the stamped lien entry forms, the unfiled (but lien-stamped) Oklahoma Title Applications and MTI's Original Title Documentation; and (iii) that Associates had failed to deliver to MTI the aforesaid documents with instructions to register the vehicles and pay all taxes to the Oklahoma Tax Commission <u>within 30 days of purchase</u> of the vehicles (<u>which dates had passed a year prior to filing the Lien Entry Forms</u>!).

105.    After Manti learned in October of 2005 that no New York titles had ever been issued

---

[31] Ex. 6 Associates' Motion for Summary judgment pp 3-19

[32] Ex. 6 Associates Motion for Summary Judgment at p. 16, ¶10.

for his buses, he continued his investigation into the existence of liens and titles in other states. After

contacting CitiCapital, he <u>first discovered</u> that liens had purportedly been filed on his vehicles in

Oklahoma.

106.     Based upon requests by MTI in January and February of 2006 Manti received from the

Oklahoma Tax Commission copies of the lien entry forms and filing receipts, annexed hereto as **Exhibit**

**X**, the existence of which he was completely unaware until that time.

107.     Based upon inquiry to GECC in February of 2006, Manti received from GECC on

February 22, 2006, MTI's Original Title Documentation for 11 of MTI's buses, retrieved from GECC

files[33] <u>including Lien Entry Form "Copy 1- Secured Party Master File"</u> and "Copy 4 - Lien Release"

signed and dated by GECC's Bonnie Hunt on February 21, 2006, all of which are annexed hereto as

**Exhibit Y.** <u>This package contained the actual original documents, which Manti had never before</u>

<u>possessed, which was to have been (but never was) filed with the NYS DMV at the time he purchased</u>

<u>the buses six years earlier.</u>

108.     Manti never requested that his buses be titled in Oklahoma, nor did he ever intend to

operate his buses in Oklahoma.

109.     *Manti made innumerable requests to Associates between November 18, 1999 and

September 2000 for delivery of certificates of title to the 18 buses purchased by MTI during that

period.

110.     *Neither Shute, Umberger, Pelka, nor any other individual at Associates ever advised

---

[33] Acquired from CitiCapital, into which Associates had merged

Manti that applications for titles or liens would be or had been filed in Oklahoma.

111.    *At no time through the closing of the *Manti I* case by the District Court Clerk in June 2002, did MTI ever receive a certificate of title from any jurisdiction or a notice of recorded lien for any of the 18 vehicles purchased on or after November 18, 1999.

112.    At no time were the Original Oklahoma Title Applications prepared by Road Ready ever filed with the Oklahoma Tax Commission; nor were MTI's buses ever registered in Oklahoma; nor were Oklahoma certificates of title were ever issued to MTI..

113.    Had Judge Block been aware of the aforesaid facts he would not have granted Associates summary judgment.


## C.  Premature, undisclosed applications for clean titles to Associates

### New York

114.    On January 19, 2001[34] (after the commencement of *Manti I*, and prior to Associates' motion for summary judgment dated May 4,2001) Helen Krueger, Associates' "Title Coordinator" signed an application for a NYS certificate of title directly in the name of Associates.[35]

115.    The Application was accompanied by DMV Form 950, Krueger's "Affirmation of

---

[34] This was the same day that Road Ready's R. Carrington, on behalf of Associates signed an application for an Oklahoma Lien based upon an application for an Oklahoma title in the name of MTI (Ex. X p. 36 and see similar title applications e.g. Ex. Y,p.5). The Oklahoma applications were on forms to create liens upon purchase, citing a security agreement date of August 21, 2000 (the date of final refinance); the New York filing sought a title in the name of Associates after repossession.

[35] Ex. L. p.7

Repossession and Bill of Sale"[36] which recited that the borrower "was in default under a security

contract dated 8/21/00."

116.    The statement in the prior paragraph was merely an allegation, not a fact, inasmuch as

(**I**) litigation was pending on the date of the Affirmation; (**ii**) Associates had alleged in its counterclaims

that MTI had breached the security agreements and that Associates was entitled to judgment

thereupon;[37](**iii**) MTI had specifically denied these allegations and had set forth six Affirmative

Defenses;[38] (**iv**) Associates had not yet even filed its motion for summary judgment which was not

signed until May 4, 2001;        (**v**) Judge Block did not decide the rights of the parties until his

Memorandum and Order of March 8, 2002;[39] and (**vi**) judgment was not entered until June 17, 2002.[40]

117.    Krueger's Affirmation also stated that she had complied with the notice requirements of

VTL §425(1)[41] and that the vehicle had been repossessed in New Jersey on December 15, 2000.

---

[36] Ex. L-13 p.9

[37] Exhibit 3, pp 10-12

[38] Ex. 4, pp 2-4

[39] Ex. 8

[40] Ex. 1 (docket sheet); Ex. 9 (judgment)

[41] **§ 425. Repossession of motor vehicle or motorcycle; garageman's lien; notice to police**
1. Any person, firm or corporation, or agent, employee or representative thereof, repossessing or retaking a motor vehicle or motorcycle pursuant to the provisions of article nine of the uniform commercial code, or other authority of law, or any contract or agreement, shall, immediately following such repossession or retaking, personally appear at a station house or other office of the police department, or agency or officer performing like functions, in the locality wherein such repossession or retaking occurred, give notice to such department, agency or officer of such repossession or retaking and thereafter and within twenty-four hours personally deliver or mail by special delivery first class mail to the nearest motor vehicle district office, (a) notice of such repossession or retaking in such form as the commissioner may require and (b) the number plates of such motor vehicle or motorcycle. Notice of such repossession or retaking, including the name and address of the person, firm or corporation repossessing or retaking the same, shall also be given within twenty-four hours thereof to the owner of such motor vehicle or motorcycle, either personally or by registered or certified mail directed to such owner at his last-known address. Unless the motor vehicle or motorcycle can be repossessed or retaken without breach of the peace, it shall be repossessed or retaken by legal process, but nothing herein contained shall be construed to authorize a violation of the criminal law.

118.    The statement of compliance in the prior paragraph were untrue on their face inasmuch

as

    a. Notice was not given"immediately following repossession" on December 15, 2001
        but purportedly over one month later, on January 20, 2001;

    b. Notice was not given to the police department in "the locality where the repossession
        occurred (i.e., New Jersey), but rather,  the affirmation states notice was given
        to the "Staten Island, NYPD";

    c.  There is no specificity as to which precinct or individual was notified;

    d.  There is no proof that either the NYS DMV, MTI, or Alfred J. "Mantis"[sic] was
        actually notified.

119.    As Associates" "Title Coordinator", Helen Krueger was, or should have been familiar

with the NYS procedures outlined in the DMV manual for Lenders (**Exhibit 17**, hereto).

120.     As Associates" "Title Coordinator", Helen Krueger was, or should have been familiar

with the NYS Vehicle and Traffic Law §2115, which provides:

> (b) If the interest of the owner is terminated or the vehicle is sold under
> a security agreement by a lienholder, the transferee shall promptly mail
> or deliver to the commissioner the last certificate of title if available to
> him, his application for a new certificate in the form the commissioner
> prescribes, and an affidavit made by or on behalf of the lienholder that
> the vehicle was repossessed and that **the interest of the owner was
> lawfully terminated** or sold pursuant to the terms of the security
> agreement.  If the lienholder succeeds to the interest of the owner and
> holds the vehicle for resale, he need not secure a new certificate of title
> but, upon transfer to another person, shall promptly mail or deliver to
> the transferee the certificate, if available, affidavit and other documents
> required to be sent to the commissioner by the transferee. (emphasis
> added)

121.    The Krueger Affirmation as false in that the interest of the owner had not been "lawfully

terminated" at the time the Affirmation was signed, nor had it been at the time the Affirmation was filed

with the NYS DMV.

122.    Pages 5-11 of the Lender's Procedures Manual requires that to properly document a repossession, a lender <u>must check "box 2" on form MV-901 "Notice of Recorded Lien"</u>[42].

123.    At the time of completion of her title application Krueger did not have in her possession a "Notice for Recorded Lien" because <u>Associates never received one from DMV because no lien was ever recorded in New York in favor of Associates, because no New York title was ever issued in the name of MTI,  because no New York title application was ever field</u> .

124.    The Lenders's Procedures Manual provides that a lien is recorded in one of two ways. If the vehicle is purchased from a NYS registered dealer, the dealer completes the lienholder information on form MV-82 (Vehicle Registration/Title Application), which was the applicable procedure with regard to both these buses, having been purchased from Action. Alternatively, if the buses were not purchased from a registered dealer, the lender could file its own Notice of Lien (Form MV-900). [43] In the case of these two vehicles, neither of these procedures were followed, <u>thus Associates had no recorded lien, a fact which should have been facially apparent to a "Title Coordinator</u>."

125.    Notwithstanding to absence of critical information, which, at least should have alerted Krueger to a problem with Associates' documentation, and the possibility that Associates might not be entitled to repossess the subject vehicles,  she proceeded to file the title applications.

_____

[42] "The MV-901 is a computer-printed form which is mailed to the lienholder when a title containing a lien is mailed to the owner of the vehicle..." (Ex 17 at p 11)

[43]Ex. 17 pp. 3, 11

126.    Krueger also  failed to file required Form MV-327 ("Notice of Repossession of a Motor Vehicle")[44] which <u>requires the lender to remove and return the license plates </u>for each repossessed vehicle to the DMV.  Under the unique facts of this case, there were <u>no license plates to return in January 1999, precisely because the Original Title Documentation with the Application for Registration/Title (from MV-82) were never filed with the NYS DMV </u>in August 2000 when MTI purchased the buses from Action.

127.    The absence of license plates on vehicles purchased five months prior to the lender's application for post-repossession titles in its own name, combined with the absence of Notice of Recorded Lien and absence of a New York certificate of title to each of these two buses did or should have created a serious issue to Associates'"Title Coordinator" as to the validity of her actions, and should have raised the issue of whether there was any pending litigation, even if she did not have actual knowledge of such pending litigation.

128.    Notwithstanding the existence of such warning signs, Krueger proceeded with actual knowledge or reckless disregard to obtain New York certificates of title naming Associates as Owner.

129.    The fact that the NYS DMV actually issued Associates title on February 2, 2001 to the vehicle described in Ex. L-13[45] and also for the vehicle described in Ex. L-12[46], for which an identical application was apparently simultaneously made, does not excuse either (I) Associates penchant throughout this case for "adjusting the facts to fit their needs" or (ii) the undeniable fact that Associates

---

[44]Ex. 17 p. 18

[45] L-13, p.5

[46] L-12, p.7

had no legal basis for filing an application for a post-repossession title until the June 2002 judgment, 17 months after the date of the Affirmation,  "lawfully terminating" MTI's ownership interest, or at least until the March 2002 Order granting Associates summary judgment.

<u>West Virginia</u>

130.     October 2, 2001 and October 5, 2001 (subsequent to Associates' motion for summary judgment and <u>prior to the Court's decision</u>) Associates filed with the West Virginia Department of Transportation, Division of Motor Vehicles, Applications for post-repossession certificates of title in the name of Associates for  three of MTI's vehicles.[47]

131.     Each West Virginia title application was supported by an "Affidavit for Repossession of a Vehicle"[48] signed in Texas by a representative of Associates, stating: "<u>[N]o legal suit is now pending in any court concerning this repossession.</u>"

132.     By reason of the pendency of *Manti I* at the time these Affidavits were sworn to, the Affidavits were false.

133.     Each West Virginia title application was also supported by an Affidavit signed in Texas by a representative of Associates, stating:"Citicapital formally [sic] the Associates has <u>never received or</u>

---

[47]L-1(II), L-3(II) and L-4(II) . Exhibit letters followed by the designation "(II)"are first annexed th this Amended Complaint. Those without the parenthetical "II" were referenced in the Original Complaint in this action, by incorporating exhibits to the PASC in *Manti I*. To the extent that any exhibits to the PASC are referred to in the within Amended Complaint in *Manti II* they are deemed to be exhibits hereto.

[48] L-1(II) at p. 13,  L-3(II) at p.8 and L-4(II) at p. 13

Lost the title to the following unit[49]" or "Citicapital... never received the title to the following unit...".[50]

134.    At the time the aforesaid statements as to the whereabouts of MTI's certificates of titles, the statements were false or made with reckless disregard for the truth, inasmuch as Associates had in its possession at that time the Original Title Documentation obtained by MTI upon its purchase of at least 17 of the 18 vehicles (including the three sought to be titled in West Virginia) which documentation included the original certificates of title indorsed to MTI, which had never been filed with the NYS DMV, but which on January 29, 2001 had been stamped "Lien Entered" by the Oklahoma Tax Commission, along with Applications for Oklahoma certificates of title in the name of MTI which had been prepared by Road Ready on behalf of Associates, but which Associates had elected (in violation of Oklahoma law) not to transmit to MTI for filing in Oklahoma.

135.  Associates attached a third Affidavit to each West Virginia title application, to establish a basis for that state's jurisdiction to issue clean certificates of title after allegedly proper and uncontested repossessions stating: "We are frequently required to make foreclosures and repossessions requiring titles in the State of West Virginia. One of our may offices in the State of West Virginia is located at 43441 US RT 60 East, Huntington, WV 25705".[51]

136.    The aforesaid Affidavits were intended to and actually did induce the State of West Virginia to issue three certificates of title to Associates.

---

[49]  L-1(II) at p. 14 and L-4(II) at p. 14

[50] L-3(II) at p. 10

[51] (Ex. L-1(II) p.20; *see also* Ex. L-3(II) p. 16, L-4(II) p. 21.

137.    Associates failed to disclose to Judge Block both the applications for and the issuance of post-repossession West Virginia certificates of title in the name of Associates, notwithstanding the fact that at that time Judge Block had not yet decided Associates' motion for summary judgment on its right to repossess the vehicles under its security agreements.

Indiana

138.    On May 2, 2001 (two days prior to the signatures on Associates' motion for summary judgment) Associates signed Applications for post-repossession certificates of title in the name of Associates for seven of MTI's vehicles, and for one more on July 16, 2001.  These transactions are detailed in the Table annexed hereto as **Exhibit 18.**

139.    Each Indiana title application was supported by an  "Affidavit for Repossessed Motor Vehicle" reciting Associates' repossession based upon the owner's failure to make payment under liens dated 8/21/00."[52]  Each Affidavit was signed by a representative of Associates.

140.    Each Affidavit for Repossessed Motor Vehicle recited that the subject vehicle had been previously purchased from Associates; had been registered in New York; and that title had been issued to MTI.

141.    By reason of: (I) the pendency of *Manti I* ,in which the rights of the respective parties had not yet been determined at the time these Affidavits were sworn to; (ii) the fact that the vehicles had been purchased from third parties, not from Associates; (iii) the fact that the vehicles had never been registered in New York; and (iv) the fact that no title had ever been issued in the name of MTI, the

---

[52] (Ex. L-2(II) at p. 11; L-5(II) at p. 17; L-8(II) at p. 13; L-9(II) at p. 11; L-10(II) at p.11; L-11(II) at p. 19; L-14(II) at p. 10; and L-15(II) at p. 12

Affidavits were false.

142.   Each Indiana title application was also supported by an "Affidavit of Repossession Without Title" signed  by a representative of Associates stating (i)that Associates was a Dealer which had sold the vehicle to MTI ; (ii) that there was no prior owner;  (iii) omitting (or stating as "unknown") the title number of the prior certificate of title; and (iv) asserting that Associates as dealer had purchased the vehicle on July 21, 2000 (a date exactly one month prior to the stated date of sale "by Associates" to MTI).[53]

143.   At the time the aforesaid statements as to the whereabouts of MTI's certificates of titles, the statements were false or made with reckless disregard for the truth, inasmuch as Associates had in its possession at that time the Original Title Documentation obtained by MTI upon its purchase of all 18 vehicles (including the eight sought to be titled in West Virginia) which documentation included the original certificates of title indorsed to MTI, which had never been filed with the NYS DMV, but which on January 29, 2001 had been stamped "Lien Entered" by the Oklahoma Tax Commission, along with Applications for Oklahoma certificates of title in the name of MTI which had been prepared by Road Ready on behalf of Associates, but which Associates had elected (in violation of Oklahoma law) not to transmit to MTI for filing in Oklahoma.

144.   By reason of Associates possession of MTI's Original Title Documentation, Associates knew that  (I) MTI did not purchase the buses from Associates; (ii) the name of each prior owner which had indorsed its certificate of title to MTI;  (iii) the actual title number of the prior certificate of

---

[53]L-2(II) at p. 12; L-5(II) at p. 17; L-8(II) at p. 14; L-9(II) at p. 12; L-10(II) at p.12; L-11(II) at p. 20; L-14(II) at p. 11; and L-15(II) at p. 11

title; and (iv) that Associates had not purchased any of the vehicles on July 21, 2000.

145.    Annexed to each Indiana title application, Associates provided a copy of the security agreement upon which it based its right to repossession, implicitly representing that it was a true copy. As to the seven applications dated May 2, 2001, however, Associates removed the actual Schedule A (list of vehicles) which had been signed by Manti when he signed the security agreements on August 21, 2000, and substituted a different list, which was typed on an Associates blank form and was unsigned.[54]

146.    The aforesaid Affidavits were intended to and actually did induce the State of Indiana to issue eight certificates of title to Associates.

147.    Associates failed to disclose to Judge Block both the applications for and the issuance of post-repossession Indiana certificates of title in the name of Associates, at any time before or after the filing of Associates' motion for summary judgment on its right to repossess the vehicles under its security agreements.

### D.  Premature, undisclosed, commercially unreasonable disposition of collateral

148.    Prior to the Judgment of August 2002, Associates disposed of most, if not all MTI's vehicles. [55]

149.    Prior to Judge Block's Order granting summary judgment, Associates made the

---

[54] Ex. L-5(II) at p. 20; L-8(II) at p. 15; L-9(II) at p. 13; L-10(II) at p.14; L-11(II) at p. 30; L-12(II) at p.12; L-15(II) at p. 13. **compare** L-2(II) p. 17 (original)

[55] To date, Manti has documented the transfers of 11 of the 18 buses. In addition, possession of two (Ex. H-2/J-1 and H-2/J-2 has been identified as still being with CT, the seller of the buses to MTI, who has registered the buses but never re-titled them in the name of CT. The location of the remaining 5 buses has not yet been ascertained.

following transfers:

    a.    Using its newly acquired Indiana title, Associates disposed of the vehicle identified as **Ex. L-2** on August 13, 2001.[56]

    b.    Using its newly acquired West Virginia Title, Associates disposed of the vehicle identified as **Ex. L-1** on November 16, 2001.[57]

150.    Subsequent to Judge Block's Order of March 8, 2002 which was entered on March 11, 2002 and prior to both the expiration of 30 days for MTI to appeal and the entry of judgment, Associates disposed of no fewer than nine of MTI's buses.[58]

151.    Associates failed to disclose to the Court that it had disposed of the vehicles.    152. Associates' disposition of the collateral was commercially unreasonable.

    a.    Associates sold bus **L-9** for $5,000, notwithstanding that Associates had loaned MTI $60,000 for this bus, that MTI had reconditioned it to "mint" condition and had never commercially operated it after purchase.[59]

    b.    Associates sold buses **L-12** and **L-13** for $5,250 each, notwithstanding that Associates had loaned MTI $60,000 each for these buses, that MTI had reconditioned them to "mint" condition and had never commercially operated them after purchase.[60]

---

[56] Ex. L-2(II) pp 23-29. Exhibits denominated "L-x(II)" provided documents obtained subsequent to the commencement of this action, with regard the disposition by Associates of MTI's buses during the course of *Manti I* as to which Judge Block was never informed. The exhibit numbering system uses the same letters as the exhibits in the PASC, followed by "(II)". thus Ex. L-2(II) revers to the bus purchased by MTI from Action, earlier documentation for which is annexed to the PASC as Ex. L-2. The L-x(II) exhibits are annexed to this Amended Complaint, and form the raw material for the tables annexed hereto as Ex. 18 "Table of Disposition of Buses"

[57] Ex. L-1(II) p 24

[58] Ex. 18, Table of Disposition of Buses, Summary by Disposition Date, and Tables for individual buses, as well as supporting documentation referred to therein, as Exhibits L(II). Upon information and belief at least 9 buses were sold at "auction" held on March 14, 2002, three days after entry of the Court's Order, with titling following, through April 25, 2002.

[59] Ex. L-9(II) pp 28-31

[60]Ex. L-12(II) pp 8-12; L-13(II) pp.11-17

-38-

c.      The purchaser of bus **L-12** from Associates subsequently resold it  for $2,750 more than Associates sold it for[61], and that purchaser again re-sold the vehicle almost two years after the sale by Associates, for $5,000[62]

d.      The purchaser of bus **L-13** from Associates immediately  resold it  for $14,000 (almost three times Associates sale price), and that purchaser again re-sold the vehicle four years later for $8,000.[63]

e.      The vehicles identified as Exhibits **L-5, L-8 and L-11**, were sold by Associates, using its new Indiana Titles, to Easter's Auto & Bus Sales in Virginia, on March 14, 2002[64], and April 19, 2002[65] for as yet undetermined amounts. Immediately thereafter, Easter's sold the buses for $25,000, 26,500 and $24,500[66], respectively, to third parties. Upon discovering this, Manti, who had paid $60,000 for each of these buses, placed several phone calls to Easter's Auto & Bus Sales, which resulted in threats to Manti's life by Bobby Easter, and a police report filed by Manti on  September 9, 2006.[67]

f.      Although plaintiffs have not yet determined the disposition prices of the remaining vehicles, including the vehicles still in possession of CT Lines, upon information and belief (based upon Associates' aggressive efforts to obtain clean titles in its name, the low sale prices of the known dispositions, and the reaction of Bobby Easter when being questioned) Associates' disposition of the balance of its collateral was also commercially unreasonable.

## E.  Concealment from the Court and failure to credit proceeds of collateral

153.    At no time during the pendency of *Manti I* did Associates disclose to the court that it

---

[61] Ex. 18 and Ex. L-12(II) pp16-19

[62]Ex 18 and Ex. L-12(II) pp. 20-23

[63]Ex. 18 and Ex. L-13(II) pp 11-17

[64]Ex. L-5(II) p. 40;  L-11(II) p.40

[65] Ex. L-8(II) p. 32. Va. Title issued to Easter's Auto & Bus Sales, Inc on 4/19/02. It is likely that the vehicle was actually purchased from Associates with the other two on March 14, 2002

[66] Ex. L-5(II) pp34-40; Ex. L-8(II) pp 17-32; Ex. L-11(II) pp 37-40

[67] Ex. 19

had disposed of any of MTI's 18 buses.

154.    At no time during the pendency of *Manti I* did Associates credit MTI with the

proceeds of disposition of any of MTI's 18 buses.

155.    Neither the calculations for judgment prepared by Associates nor the judgment

submitted and entered reflected credit for the proceeds of disposition of any of MTI's 18 buses.

**Meritorious Defense/Claim**

A. Counterclaims on Security Agreements

156.    In the event the Court grants Plaintiff's request to vacate the Order and Judgment to the

extent they resulted in summary judgment against MTI on Associates counterclaims for breach of

security agreements, then plaintiffs would have the ability to prove the existence of defenses to those

security agreements.

157.    The above recitation establishes that MTI would have  meritorious defense to the

counterclaim to enforce the security agreements based upon Associates' conduct which prevented MTI

from ever operating the financed vehicles. These defenses could take the form of failure of

consideration, fraud and breach of contract.

158.    In addition, the security agreements themselves contain two provisions which MTI

could assert were breached by Associates. Paragraph 6 of the security agreements grant Associates a

limited power of attorney to take any action required to perfect their liens.[68]

> Debtor hereby appoints Secured Party or any duly authorized officer or employee of Secured Party as Debtor's attorney-in-fact to, in Debtor's or Secured party's name: ...(b) prepare, execute and file any instrument which, in Secured party's opinion, is required by law to perfect and to give or modify public notice of Secured party's interest in the Collateral....This power of attorney is coupled with an interest and is irrevocable so long as any indebtedness secured hereunder remains unpaid

159.    Action, as a Dealer, defined by NY Vehicle and Traffic Law ("VTL") §214, is

required, pursuant to VTL §2114 to :

> "promptly execute the assignment and warranty of title by a dealer, showing the names and addresses of the transferee and of any lienholder holding a security interest created or reserved at the time of the resale, in the spaces provided therefor on the certificate or as the commissioner prescribes, and mail or deliver the certificate to the commissioner with the transferee's application for a new certificate."

160.    *Shute requested and directed Action to deliver MTI's Original Title Documentation to

Associates.

161.    Action complied with its obligations under VTL §2114 by delivering the original

Certificates of Title and New York State Retail Certificates of Sale, along with lien satisfaction of the

prior lien holders, and signed Applications for NY certificates of title/registration  to Associates as agent

for MTI, and Associates received same.

162.    Pursuant to VTL §2104 MTI was required to obtain a certificate of Title to each

vehicle within 30 days of acquiring ownership:

---

[68] Ex. 3, pp. 42,53

(a) Every owner of a vehicle which is in this state and is not excluded from provisions of this title by section two thousand one hundred two of this article, and for which no certificate of title has been issued by the commissioner shall make application to the commissioner for a certificate of title of the vehicle within thirty days after transfer to him of the vehicle;

163.    Pursuant to VTL § 2119, Associates was required to immediately record its lien on each of MTI's vehicles:

2119 Security Interest: If an owner creates a security interest in a vehicle:

(a) The owner shall, if the lienholder so requests, execute the application, in the space provided therefor on the certificate of title or on a separate form the commissioner prescribes, to name the lienholder on the certificate, showing the name and address of the lienholder, and cause the certificate, application and the required fee to be delivered to the lienholder.

(b) The lienholder shall, immediately after the owner complies with subdivision (a), cause the certificate, application and the required fee to be mailed or delivered to the commissioner.

164.     *By failing to file the title applications, noting their liens thereupon  with the NYS DMV, Associates not only breached the provisions of the Vehicle and Traffic Law, but also prevented perfection of its own liens in addition to preventing MTI from obtaining the wherewithal to operate its buses, and also constituted a breach of Associates express and implied obligations under these contracts.

165.    *By filing Lien Entry forms in Oklahoma (albeit a year after the buses were purchased) but never complying with its obligation to then deliver the Original Title Documentation (then stamped "Lien Entered- Oklahoma Tax Commission") back to Manti, so he could complete the titling and

-42-

registration process by paying the Oklahoma excise tax, Associates also breached its contract obligations to perfect its liens.

166.    The security agreements also contain the language just above the signature lines

> all of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.[69]

167.    *By withholding the titles, thus preventing MTI from operating, after requiring Manti to check this box at the same time he signed the security agreement, Associates not only fraudulently induced MTI to sign the equipment acceptance (thus triggering the commencement of monthly payment obligations), but also breached its express obligations under the contract as well as its implied obligation of good faith and fair dealing.

168.    Accordingly, if this Court were to allow MTI to defend the counterclaims for breach of security agreement on the merits, MTI would be able to establish numerous meritorious defenses.

## B. Counterclaim on Release

169.    Based upon the foregoing facts, MTI can establish a meritorious defense to the counterclaim for breach of the release by reason of unenforceability for failure of consideration, fraud, willful breach of a material term, and breach of so substantial a term as to render the purpose of granting the release unattainable.

---

[69] Ex. 3 pp. 44, 54

C. MTI's Affirmative Claim against Associates

170.    Further, if the court determines that the Release is unenforceable, the Court may rescind it, thereby granting Plaintiffs the right to pursue the previously dismissed Complaint in *Manti I* (which had been barred by reason of the Release), and, subject to permission of this Court, to amend the complaint in that earlier action.  The annexed affidavit of William Bailey[70] establishes the truth of many of Plaintiff's allegations in the PASC, namely that money was stolen, that documents were forged to cover up the thefts, and that Shute and others had conspired to put MTI out of business, commencing in March 1998.

171.    Furthermore, as to events which post-dated the Release, and which were never fully developed in Manti I, due in part to Judge Block's denial of a request for permission to file a motion to amend the Complaint, the documentation set forth herein, and in the annexed Exhibits, establishes that in the event this Court were to vacate Judge Block's Order on the Counterclaims, as well as rescind the Release which had barred Plaintiff's original complaint, Plaintiffs could establish that Shute and others at Associates conspired to and did in fact prevent  MTI from obtaining Certificates of Title to the 18 buses purchased on and after November 18, 1999.  Associates breached its obligations to record their security agreements and to deliver certificates of title, and thereby failed to properly deliver the "equipment" to the Debtor, as called for by the Security Agreements.  Thus, Associates was in breach of its own Security Agreements upon which it was suing (in addition being in violation of criminal provisions of the NYS Vehicle and Traffic Law).

_____

[70]Ex. 11

172.    The fact that MTI made no payments on the security agreements was irrelevant, because Associates' illegal conduct established a complete defense for Manti.

173.    Associates, in forcing Manti to sign this false acknowledgment of delivery of equipment as a condition for the final refinance and as Manti's only chance to prevent impending repossession, both placed Manti in a position of duress, and also committed a fraud upon Manti.

174.    Furthermore, in concealing highly relevant information from Judge Block, Associates, committed a fraud upon the Court.  If the Court had been aware of all these facts, it would not have granted Summary Judgment to Associates, nor dismissed MTI's complaint.

175.    Accordingly, an Order vacating Judge Block's Order and Judgment in whole or in part would not be an empty exercise, or Plaintiffs could establish meritorious defenses to the counterclaims and prove its affirmative case against Associates.

## COUNT I

## RELIEF FROM ORDER AND JUDGMENT IN ORIGINAL ACTION
## ON GROUNDS OF FRAUD UPON THE COURT

### Basis for Relief

176.    FRCP 60(b) provides that a motion for relief from an Order or Judgment based upon

newly discovered evidence or fraud must be made within one year of entry. [71]

Nevertheless the rule specifies:

> This rule does not limit the power of a court to entertain an independent
> action to relieve a party from a judgment, order, or proceeding, or to
> grant relief to a defendant not actually personally notified as provided in
> Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the
> court. Writs of coram nobis, coram vobis, audita querela, and bills of
> review and bills in the nature of a bill of review, are abolished, and the
> procedure for obtaining any relief from a judgment shall be by motion
> as prescribed in these rules or by an independent action (emphasis
> added).

---

[71](b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

### Grounds for Relief

177.    This action is brought based upon the recently discovered evidence of fraud and

criminality, the alleged absence of which formed the basis for Associates' (unsuccessful) motion for

`sanctions, as well as Associates (successful) motion for summary judgment in the original action.

178.    Plaintiff seeks to have (I) the Order granting Summary Judgment and (ii) the Judgment

(a) dismissing MTI's  complaint and (b) granting Associates a money judgment on its counterclaims

against MTI, vacated for fraud.

179.    **It has recently been substantiated through documentary evidence and affidavits**

**that the documents and affidavits submitted by Associates in the original action were**

**permeated by false statements in an effort by Shute to cover-up criminal activity being**

**perpetrated by Shute and others at Associates.**[72]

180.    In essence, Associates presented its counterclaims based upon the August 21, 2000

contracts as typical claims of a bona-fide lender in a simple collection case against a purchaser of buses

who had defaulted on payments.  Associates characterized Manti's case in chief, in effect,  as an

unjustified, bad-faith lawsuit by a borrower which had previously executed a negotiated mutual release

in the course of the November 18, 1999 ordinary-course refinance of existing loans.  The result in the

case  (Associates succeeded on all its positions, except its request for sanctions against Manti's

counsel) establishes that through their submissions, Associates convinced Judge Block that, as a

---

[72] Although Judge Block ruled that the Release barred claims as to such conduct; however if this Court vacates his Order and Judgment, and if the Release is rescinded, those issues can again be addressed.

nationwide institutional lender, it had greater credibility than the operator of a defunct bus company which did not make its contractually agreed loan payments; and that Associates, proceeding in good faith in a run-of-the mill type collection case had properly substantiated its position.

181.    **The actual facts, as they can <u>now</u> be documented, establish that the papers filed by Associates in the original case were perjurious, and constituted just one more of a series of actions by Associates' personnel, over a period of 2 ½ years,  calculated to put MTI out of business as a way of silencing Manti, and preventing public disclosure of his discovery of criminal activity and pervasive corruption within the Associates organization.**

182.    *The August 21, 2000 security agreements were <u>not</u>, as stated by Associates, simply refinances of <u>purchase-money security agreements</u> (Answer ¶¶ 89, 97) that MTI had defaulted on. Rather they represented a unique refinance, specially negotiated<u> in person, at Associates' corporate headquarters in Irving, Texas, between Manti and Lawrence Pelka, Associates' President</u>  This was an agreement calculated by Associates to induce Manti's acceptance (since it offered a cure of all arrears, thus removing what Shute had claimed was the impediment to delivery of Certificates of Titles to the 18 vehicles purchased with Associates's funds, but not operable absent receipt of Titles; and by providing Manti with $50,000 in cash), without disclosing Associates' intention never to comply with its terms.[73] This Agreement was intended by Pelka and others at Associates to  keep Manti "out of the way" until a pending merger with Citigroup (then not publicly announced, or known to Manti) was completed.  At the time of negotiation of this Agreement, Associates' senior management was fully aware of Manti's

---

[73] Even after this refinance, Manti never received the Certificates of Title.

-48-

discovery of forged documents and the theft of cash contract deposits; as well as Manti's complaint that

he had not received certificates of title to the 18 vehicles he had purchased between November 18,

1999 and August 2000.  Associates' entering into these Security Agreements <u>with full knowledge of the</u>

<u>underlying facts</u>, represented an attempt at the highest levels in Associates to cover up not only criminal

activity involving the theft of cash contract deposits, and forgery of documents, which occurred prior to

the purported execution of the "Mutual Release", but also to cover up <u>subsequent criminal activity</u> by

Larry Shute (Associates' Pennsylvania Branch manager) and the entire Associates' Pennsylvania office

in illegally preventing MTI from the obtaining certificates of title to the vehicles purchased.[74]

183.    *Furthermore, just as the <u>security agreements</u> sued upon in Associates' counterclaims

were ***not ordinary*** (as the documents submitted by Associates in the original action suggested), the

purported "<u>Mutual Release</u>" ***did not arise from an ordinary-course*** loan refinance. To the contrary,

the purported release dated November 18, 1999 ***even if it was, in fact***, executed by Mr. Manti, was

nevertheless part of the November 18, 1999 refinance: ***also a unique transaction***.  This refinance

was the culmination of 1 ½ years of negotiations between Manti's counsel and Metrotrans, regarding

payment of the balance due on old loans covering vehicles surrendered by Manti, at Shute's request in

July of 1998. When Metrotrans filed bankruptcy and failed to pay the agreed balance to Associates

(being the consideration for Manti's agreeing not to sue Metrotrans on the forged documents of  July

1996), Manti agreed to pay that balance to Associates  in conjunction with the purchase of a fleet of

---

[74] The allegations of a high-level cover-up must be viewed in the context of a history of forgeries and thefts of cash, and reflect a concern with the serious consequences that would flow from public disclosures of Manti's discoveries. They must also be placed in context of the regulatory agency concerns with Associates' well-known practices of predatory consumer lending, publicly expressed in conjunction with the proposed Associates-Citigroup merger, discussed herein.

new vehicles, the first two of which were purchased on November 18, 1999.  The closing at which the

purported "Mutual Release" was signed occurred only because of Manti's threat to sue Associates for

putting him out of business in July of 1998 when Shute fraudulently represented that he would finance a

new fleet for Manti if Manti delivered his entire fleet back to Metrotrans.  Thus, the Release was far

from an "ordinary" document signed at a refinance closing, as Associates papers in the original action

would seem to suggest.  Rather, it had to be viewed in the context of a history of fraudulent conduct by

Associates, and Manti's being out of business as an intended  result of that conduct.[75]   184.    *Manti

had planned to be back in business by March 2000, as a result of the buses being purchased with the

financing begun on November 18, 1999.  Shute was fully aware of this timetable.  Shute's plan,

however, as is now discovered, was never to let that happen.. The facts developed herein establish that

Shute induced Manti to enter into a series of new loans commencing on November 18, 1999**, but at all

times fraudulently acted to withhold titles from the buses being purchased.**  If, in fact, the

release was executed by Manti, Shute never had any intention of complying with Associates'

obligations thereunder, as borne out of his subsequent actions in preventing Manti from receiving Titles

to the buses purchased. **Thus, by advising this Court that Manti was bound by that release,

Shute compounded the fraud perpetrated upon Manti by defrauding this Court as well.**

185.    *Most telling is the recent discovery that Shute and others at Associates had actually

taken steps to prevent Manti from obtaining Certificates of Title to the 18 buses which were the subject

---

[75]That conduct of Associates is discussed in detail in the proposed Amended and Supplemental Complaint (**Exhibit 14** herein) now sought to be filed by Manti in the original action.  Shute's inducement to Manti to deliver physical possession of  his entire fleet for a weekend "refinancing" and which had the effect of putting  MTI  out of business was just one step in Shute's plan to "eliminate" Manti as a threat.

of Security Agreements underlying Associates counterclaims. Although Associates obtained, from sellers of these vehicles to MTI, the sellers' certificates of title and satisfactions of any outstanding liens, Associates violated its fiduciary and contractual obligations under the "power of attorney" provisions of the Security Agreements, as well as the provisions of the New York Vehicle and Traffic Law[76], by failing to deliver to the Department of Motor Vehicles those documents along with applications to transfer title to MTI, and to list Associates as lienholder.

186.    Documents just obtained from the sellers, as well as current NYS Department of Motor Vehicles records, establish that **title to these vehicles was never placed in the name of MTI**![77] Accordingly, MTI could never register these vehicles, obtain license plates, or operate the vehicles. This new evidence was not known to Manti at the time of the original action.

**187.    During the pendency of the case before Judge Block, Associates from its Texas headquarters, (while it was directing its attorneys to make motions for sanctions and summary judgment in this Court) Associates sent Manti's title documents further away, again, to a California Registration service company, which Associates directed to place Oklahoma liens upon Manti's New York vehicles. When Associates received the original title transfer documents back from Oklahoma, it then violated Oklahoma law by secreting these documents in their Texas files, rather than returning them to Manti.**

_____

[76] Allegations of specific violations of the NYS Vehicle and Traffic Law are set forth in **Exhibit 14**, of the proposed Amended and Supplemental Complaint *at* ¶¶ 204 *et seq.*

[77] Details, as well as supporting documentation are incorporated in **Exhibit 14**, the proposed Amended and Supplemental Complaint *at* Exhibits J, K, and L, therein, and referencing text.

188.     Support for this newly discovered evidence of fraud is set forth in the following documents: Affidavit of Alfred Manti (**Exhibit 10**); Affidavit of Laurence Jacobs, principal of Action Auto Leasing, the seller to MTI of 15 of the 18 vehicles (**Exhibit 12**);  Affidavit of Frank Sorvino, senior account executive of ABC Bus Sales (the source of  10 of the vehicles Manti had purchased from Action Auto Leasing, and the those vehicles were being stored) (**Exhibit13-II** [78]); and Affidavit of William Bailey (**Exhibit 11**), former Metrotrans salesman, who thereafter worked at  Lakeview Custom Coach, seller of one vehicle to Manti's in December of 1999.

189.     The principal basis for the dismissal of Manti's complaint was this Court's conclusion that the purported Mutual Release dated November 18, 1999 foreclosed Manti's action.  The consideration for the release, as set forth by Shute in the original action, was Associates' agreement to provide financing for Manti to acquire a new fleet of 18 vehicles, the first two of which were purchased on November 18, 1999.[79]

190.     The recent discovery that Shute and others at Associates actively *prevented* MTI from obtaining Certificates of Title to those 18 vehicles, renders the purported release void for failure of consideration, breach of contract, breach of fiduciary duty and fraud.

---

[78] Exhibit 13, as annexed to the Original Complaint has been superseded by Exhibit 13-II, annexed hereto, which provides additional information.

[79] *See* Motion for Summary Judgment: Affidavit of Larry Shute **Exhibit 6**:

22. Mr. Manti was eager to sign the Release and wipe the slate clean and to put everything behind him.

23. Between December 1999 and July 2000, Associates provided plaintiff with additional financing for the purchase of new buses from bus distributors other than Metrotrans."

original action, and thus constitute independent grounds for vacating the Order and Judgment.

191.    *If this Court were to vacate Judge Block's Order and Judgment, the evidence submitted herein, inclusive of the PASC in the original action, with attached exhibits, enables Plaintiffs to prove at trial:

> (i) that Associates breached its obligation under the terms of the Security Agreements to deliver not just the financing, but also the usable vehicles (for which Associates billed Manti on the face of the Security Agreement the sum of $715 for "title fees to Road-Ready Registration"[80]);

> (ii) that Associates  breached both its contractual and fiduciary obligations under the limited power of attorney appearing in the fine print of the security agreement to receive title documents and process them through the NYS DMV;

> (iii) that Associates violated criminal provisions of the NYS Vehicle and Traffic Law by failing to deliver title documents to the DMV for the purpose of obtaining certificates of title in the name of MTI, failing to record Associates liens on 18 vehicles,  and, upon information and belief, filing with the Department of Motor Vehicles false affidavits of lawful repossession and good title as to three of the 18 vehicles which received New York titles, in names other than MTI, after Associates' repossession of same.

192.    *Plaintiffs could also prove that, in addition to withholding the titles for the vehicles covered by the Security Agreements sued on by Associates in their counterclaims, the defendants engaged in purposeful action designed to prevent MTI from operating any buses from July of 1998 through the date of commencement of the original action in October of 2000.

193.    Accordingly,  Associates' Answer, Counterclaim and motion for summary judgment

---

[80] See **Exhibit 14** proposed Amended and Supplemental Complaint, Exhibit P-1, Security Agreement dated August 21, 2000, forming the basis of Associates first counterclaim in the original action.

had absolutely no basis in fact or law, and constituted not only a fraud upon MTI, but also a fraud upon

this Court!

**194.     The import of this newly acquired evidence is that Shute's Affidavit on the**

**motion for summary judgment, indicating that MTI was in default, was a deliberate lie: the**

**condition precedent for MTI to make payment, was Associates' compliance with its**

**obligations under both its contract with MTI, and under the NYS Motor Vehicle Law to record**

**its liens and to deliver certificates of title. Furthermore Shute's assertion that MTI had no**

**factual or legal basis for its claim that Associates interfered with its business was also a**

**deliberate lie. In effect, all the papers submitted by Associates in the original action were**

**false and constituted a premeditated fraud upon this court**.

195.  Furthermore, Bailey's Affidavit sets forth a <u>clear motive</u> for the conduct of Shute and

others at Associates in forging signatures, and attempting to put MTI out of business.   Bailey confirms

what had previously only been Manti's unsubstantiated contention: no less than $75,000 in cash

contract deposits placed by Manti[81] on vehicles to be purchased from Metrotrans was stolen; the

contracts were destroyed; new contracts were written, upon which the purchase price was reduced to

hide the missing cash; and Shute forged Manti's signature on those new contracts.  When Manti

discovered the discrepancy, Shute became frightened of the potential consequences of Manti's taking

---

[81] Based upon Bailey's affidavit, it is likely that most if not all contracts between Manti's Transportation
and Associates, which involved cash deposits, were destroyed and re-written without the cash deposit showing.
This included not just the $75,000 missing from the July 1996 contracts, but also $111,000 in Manti cash deposits on
other purchases involving Metrotrans and Associates (see Exhibit E of **Exhibit 14**). It is also suspected that the
practice with regard to Manti's purchases was pervasive and involved other purchasers of vehicles from Metrotrans,
which were financed through Associates, and may have been the reason Pelka, personally, took such an interest in
keeping Manti quiet prior to the Citigroup merger.

action on this discovery, and thus, with his cohorts devised and successfully implemented a plan of action to put MTI out of business, which he pursued over many years: first by fraudulently inducing the mass surrender of Manti's fleet in the summer of 1998, and ultimately by creating the appearance of financing a new fleet commencing on November 18, 1999, while actively preventing Manti from ever placing any buses on the road.

196.    The details of Shute's plan to put MTI out of business are set forth in a proposed Amended and Supplemental Complaint (**Exhibit 14**) for use in *Manti I*.  In the event this action results in a judgment opening the original case and vacating the Order and Judgment at issue, MTI will seek permission to file this proposed Amended and Supplemental Complaint[82].

197.    *The **first part** of Shute's plan was to induce Manti to surrender his entire fleet under the guise of a simultaneous "refinancing" with replacement buses.  Shute's promise of refinancing is confirmed by the Affidavit of Joseph Wolf (**Exhibit 15**), former salesmen for New Jersey Bus Sales, one of the companies from whom Manti was to purchase new buses upon surrender of his fleet, per Shute's instructions, in July of 1998.  Associates failure to provide the promised new financing put MTI out of business for almost 1 ½ years, from July 1998 through November, 1999.

198.    Under threat of suit, Associates finally agreed to provide new financing, to commence in November 1999, with the purchase of 18 vehicles, scheduled to be delivered by March of 2000.  Associates did provide the financing for these vehicles, the last of which was purchased on or about August 17, 2000.

---

[82] To be modified to reflect recent changes in parties and Counts to be asserted.

199.    *Notwithstanding the financing, however, Shute never intended to allow Manti to operate.  He and others at Associates obtained possession of the documents necessary to transfer title to MTI, and purposely withheld them from the NYS Department of Motor Vehicles, thus perpetrated his **second scheme** to prevent MTI from operating.

200.    *Shute's second scheme required that Associates did not record their liens on the vehicles purchased on and after November 18, 1999.  To record the liens, the old certificates of title (along with any lien releases of prior lenders, and bills of sale) would have had to be submitted to the Department of Motor Vehicles, along with an application for a new title, which reflected both the new owner (i.e. MTI) and the new lienholder (i.e. Associates).  Once this paperwork was completed, the DMV would have mailed the new, original title to the new owner (i.e. MTI), with the Certificate showing Associates as lienholder.  Upon receipt of the Certificate of Title, Manti could take it to DMV and register the vehicles, obtain license plates, and operate.  Thus, to prevent Manti's from operating, *Shute had to make sure that Manti's ownership of the new buses was not recorded and that Associates' liens were not perfected.*

201.  In the ordinary course of business, a motor vehicle equipment lender, such as Associates, has a system of internal checks to assure that liens on its collateral are properly perfected within a few days of releasing funds to the borrower.  In the absence of perfection, loans are immediately declared in default and the vehicles repossessed.(*see* Jacobs Affidavit, **Exhibit 12**).  In the present case, although Associates had loaned over $1 million to MTI, between November 18, 1999 and August 2000, no New York liens were ever perfected on their collateral, to the present day.

202.    By abusing the intent of Oklahoma law, a state with which Manti did not even have a colorable relationship, Associates undertook a purposeful course of action to create the appearance of lien perfection, while intentionally continuing to deprive Manti of the ability to operate his buses.  Such a state of facts is highly unusual, and clearly implies that **persons at Associates with high supervisory power were fully aware of Shute's withholding of the titles and his failure to record Associates' liens.**

203.    *Associates put MTI  out of business in July of 1998, and it was never able to operate again.  Despite inducements by Shute that Manti could start operating again through Associates' financing, beginning in November of 1999, of a new fleet, Associates fraudulently prevented that from occurring by preventing Manti from obtaining Certificates of Title to those new vehicles.

204.    The full extent of the scheme by Shute and others at Associates was not known to either Manti or to this Court at the time Associates filed its summary judgment motion.

205.    Now that Manti has obtained supporting documentation and affidavits to substantiate his claim that he was purposely put out of business, and that he has uncovered the fraud perpetrated not only upon his company, but also upon this Court, Manti is entitled to relief from the original Order and Judgment, so that the action he commenced on October 17, 2000 can be brought to a just conclusion.

206.    In sum, upon review of the new evidence of fraud presented herein, which was not known by either Manti or the Court at the time of the original action, (if the original Order and Judgment are vacated)  Plaintiffs can establish a meritorious both a meritorious claim and a meritorious defense to Associates Counterclaims. Referring to the letter sent by Associates counsel, Mr. Katz, to

Judge Block requesting permission to file the dispositive motion in the original action (**Exhibit 5**), it is now apparent that the basis for his arguments no longer exist:

**First**, The "Mutual Release" should be rescinded for fraud, failure of consideration, and breach, thus no longer barring Manti's action.

**Second**, the MTI's original fraud claim is now supported, as set forth herein, by substantial, independent and detailed evidence of a plan to put MTI out of business, and a motive for doing so: namely to prevent him from taking action regarding his discovery of criminal activity within the Associates organization.

**Third**, as to MTI's original unjust enrichment claim, the Court should now see that this was not simply a case of Manti receiving loan proceeds and defaulting on payments. Rather, MTI paid for the seven buses without air conditioning. Once the warm weather arrived, Manti was unable to use them because Shute had prevented the required air conditioning from being installed. Although MTI could not use the buses, Associates demanded payment on the loans, which Manti could not pay since the buses were not operating. Then, using the absence of air conditioning as a pretext, Shute tricked Manti into surrender his entire fleet for a supposed simultaneous financing of a new fleet, in July 1998, which new financing was not then provided.

**Fourth,** the evidence adduced herein establishes that Associates' interference with Manti's purchase of the seven deficient buses from Metrotrans, and Associates attempts to put Manti out of business prior to the commencement of the original action "was motivated solely by malice [and] that defendant effected the interference by unlawful means."

**Fifth**, the new evidence now presented to the Court establishes additional facts and events not included in the original complaint giving rise to new causes of action not known at the time of filing the original complaint, but relating to the same circumstances, involving intentional withholding of certificates of title, and filing false documents in the original action, which give rise to additional causes of action on behalf of MTI, and Mr. Manti.

**Sixth**, as to Associates' counterclaims, although Manti has always acknowledged signing the two security agreements dated August 21, 2000, this is not, as Katz asserted, merely a case of MTI failing to make payment. Even after this final refinance, Associates continued to prevent delivery of Certificates of Title to the 18 vehicles purchased by

MTI with funds provided by Associates. The circumstances pleaded as supporting additional claims against Associates also establish valid affirmative defenses to the counterclaims, which were not known to Manti at the time of the original action, and at the very least should preclude Associates obtaining summary judgment on its causes of action based upon those two security agreements.

**Seventh**, as to the award of Attorneys fees and costs against MTI for breach of the Release, it is now clear that Manti's filing of his original action was not "for an improper business purpose", as stated by Katz in his letter of March 12, 2001, but rather was to redress the wrongful the conduct of Shute and others at Associates. Furthermore, it can now be established that the Release is unenforceable for failure of consideration, fraud and breach.

207.    Each of the aforesaid circumstances constitutes grounds to vacate the summary judgment Order and ensuing Judgment; to relieve MTI from the terms of the Release, and to allow MTI to pursue various pre-existing, amended claims.

**WHEREFORE**, it is requested that Judgment be granted:

(A) Opening the now closed case entitled "Manti's Transportation, Inc. v. Associates Commercial Corporation, Case  No. 00Civ.6807(FB) (RML)"

(B) In that action, vacating:

(i) the Order of this Court dated March 8, 2002 granting the motion of Associates for summary judgment dismissing the complaint of Manti's Transportation, Inc. and granting judgment to Associates on its counterclaims; and

(ii) the Judgment entered June 17, 2002 dismissing the complaint of Manti's Transportation, Inc., and granting a money judgment in favor of Associates, against Manti's Transportation, Inc ;

(C) In the event the aforesaid Order and Judgment are vacated, deeming the within Action to be a motion in the original action, and thereupon,

(I)  Granting Plaintiff  permission to file an Amended and Supplemental Complaint in said action,

(iv) Granting Plaintiff  permission to file an Amended Reply to Counterclaims in said action,

(vi) Upon such amended pleadings, granting summary judgment (on Associates motion for summary judgment) to Manti's Transportation and Alfred Manti against

Associates; and setting down a hearing on damages;

(D) Awarding Plaintiff costs and attorneys' fees in this Action, and

(E) Granting such other relief as appears to this Court to be just and proper.


Dated:  November 15, 2006

Staten Island, New York                    Corash & Hollender, P.C.

By _____/s/_____

Paul Hollender (PH-5834)

Attorneys for Plaintiffs

1200 South Avenue, Suite 201

The Corporate Park of Staten Island

Staten Island, New York 10314

Tel. (718) 442-4424

Fax (718) 273-4847